## TUCKER *v*. DUNCAN.

*(Circuit Court, S. D. Mississippi.* November Term, 1881.)

1. RAILROAD CROSSINGS—RECIPROCAL DUTIES OF TRAVELERS AND THE RAILROAD COMPANY.

When a crossing is dangerous, the duty is imposed upon those engaged in conducting the engine and trains upon the road, and also upon those desiring to make the crossing, to use every reasonable precaution to avoid a collision; and the necessity is increased in proportion to the danger. This duty is required equally of both parties.

2. SAME—DUTY OF TRAVELER.

Where one attempts to drive his team over a railroad crossing on a level with the highway with knowledge of its dangerous condition; that a warehouse formed an obstruction to the sight and sound of a train coming from one direction; that it was the time for making up a train and that the locomotive must pass the crossing to do so—he must both look and listen for the approach of the locomotive, and, if need be, stop for that purpose.

3. RAILROAD EMPLOYES.

Railroad employes are as worthy of belief as other agents.

At Law.

*Humphries & Sykes* and *Wiley P. Harris*, for petitioner.

*E. L. Russell, Peter Hamilton, J. M. Allen* and *L. Brame*, for defendant.

HILL, D. J.   This is a complaint made by the said Tucker, in which he alleges that on the eleventh day of October, 1880, he was with his wagon, drawn by one horse, crossing the Columbus branch of the Mobile & Ohio Railroad, on St. John street, in the city of Columbus, when, without any carelessness or default upon his part, but by the carelessness and improper conduct alone of the employes operating the engine and train of said receiver, upon said railroad, his wagon was run against and thrown over, by means of which he was thrown from his wagon and received sundry dangerous and severe wounds, endangering his life, greatly disfiguring him, and causing him great bodily pain, for which he claims $25,000 damages as compensation.   To the complaint the defendant answers that the injuries complained of were caused by the carelessness and reckless conduct of the petitioner alone, and not by the carelessness or want of skill or misconduct upon the part of his employes, as alleged in the petition.   Upon the issue thus made a large volume of evidence has been taken and submitted to the court, upon which exhaustive comment has been made by the distinguished counsel on both sides, all of which has been carefully considered, with the sole view of arriving at a correct conclusion as to whether or not, under the testimony

and rules of law applicable to it, the petitioner is entitled to compensation, and if so, for what sum. The proofs show the following indisputable facts:

The point at which the accident occurred is at the crossing of St. John street over the railroad in charge of the defendant as receiver, under the appointment of the court, and in the city of Columbus; and it is a dangerous one for those passing on this street going south, from the fact that it is near the depot, and near the side track used for switching off cars and making up trains, and over which point locomotives and trains necessarily have to pass many times during the day. The danger is further increased from the fact that there is a brick warehouse situated east of the street and north of the railroad, and extending 250 feet from near the track of the road north on the street, and 240 feet east of the street; and, being some 17 feet high, obstructs the view from those passing south on the street. The danger is still further increased by the narrowness of the street near the crossing, being only 15 or 16 feet wide, with a deep and wide ditch or washout on the west side. The street is also covered with gravel, which causes a noise when vehicles pass over it. The depot, side track, and switches used by the railroad are situated east of and near this crossing, and in making up trains the locomotives must necessarily pass it. The time for the departure of the evening train was 40 minutes after 3 P. M., and the practice was to commence making up the train an hour or more before the train time, and at the time of the occurrence complained of the locomotive was employed in making up the evening train, being about 3 o'clock P. M. It is also an indisputable fact that petitioner was driving a spring wagon loaded with rails and drawn by one horse, coming down St. John street, going south; that when near the crossing, and at a place where the street was too narrow to turn around, the locomotive approached the crossing, the horse became frightened and stopped for a moment, when petitioner urged him on with the purpose of passing in front of the locomotive; that the fore wheels of the wagon passed the end of the pilot of the engine, but that the hind wheels, or one of them, was caught on or struck the end of the pilot, which threw the wagon on its side. The horse being frightened sprang forward and disengaged himself from the wagon. The petitioner was thrown forward upon the street and was thereby greatly wounded, injured, and disfigured, causing him great pain and suffering, and which injuries may prove permanent. There was not then, and never had been, any sign-board erected at that point warning passers of approaching

trains, nor any other warnings or signals given other than the ringing of the bell or blowing of the whistle. These are all of the undisputed facts that need be stated. There are others, and upon which the questions submitted must greatly depend, about which there is more or less conflict between the witnesses of petitioner and defendant.

The conductor of the train, the engineer who was operating the engine, the brakeman who was then employed in changing the switch or throw-rail, the fireman then engaged on the locomotive and whose business it was to ring the bell, also another witness, all testify that at the time the collision took place, and before, while the locomotive was in motion, the bell was ringing. It is also in proof that soon after the accident the petitioner stated that the bell was ringing. The petitioner has introduced the testimony of a number of witnesses, stating that they were near enough to have heard the bell if it had been ringing; some speak in more positive terms that it was not rung; and others, that if it was that they did not hear it. Other witnesses state that it was the general practice to ring the bell when the engine was in motion, but that it was sometimes omitted; some witnesses stating that the omission was frequent, and others that it was not. It is also in proof that accidents have occurred at this crossing before, or were barely escaped. It was the duty of the conductor and of the engineer to see that the bell was rung, and it is to be presumed that the brakeman would also observe this duty; it was also the duty of the fireman to ring it. All these swear positively that it was rung.

The testimony on the other side is, with one or two exceptions, of a negative character, and those stating most positively do not state reasons for remembering that they were listening, and that the bell was not ringing; and then the declaration of the petitioner himself to his physician when attending to his wound immediately after the accident, explaining how it occurred—that the bell did ring—in my judgment gives a decided preponderance in favor of the proposition that the bell was rung. I cannot assent to the position that the employes of a railroad are less worthy of belief than other agents. All agents and employes are presumed to be friendly to their employer, and on that account are usually subjected to a rigid cross-examination; but when this is done, their evidence must be weighed as other testimony, and its value estimated in conection with all the acts proven.

It is contended by petitioner's counsel that no weight should be given to petitioner's declaration made in the presence of the engineer, as testified to by him, as to the ringing of the bell, because of the want of credibility of the witness, the unreasonableness of his statement,

and the suffering condition of the petitioner. I am of opinion that the statement of the witness is not unreasonable. He was but a short distance from him, and immediately sprang to him, and most probably made the inquiry before he was aware of the extent of the injury, and the answer was made when the facts were present before the mind of the petitioner.

The most satisfactory conclusions as to the real occurrences immediately preceding and at the time of the collision are to be drawn from the statement made in evidence by the petitioner himself, and his declaration made soon after to Dr. Vaughn and the physical facts attending it, as shown by the evidence and uncontroverted. The petitioner, in his deposition, in reply to the question as to how the injury complained of was occasioned, made the following answer: "As I got near the railroad crossing my horse became very much frightened at seeing the locomotive approaching, and I pulled the reins to stop him, but he was so excited I failed, or could not stop him. I said 'whoa' to him twice. He did not stop at all. The engine was then immediately in front of him. I then became wonderfully excited myself to see how I could escape myself. The street was too narrow; I could not turn round. I saw the horse was determined to go forward, and, believing it was the only chance to save my life was to let him go, I slackened the rein and he darted violently forward. The cow-catcher, to the best of my knowledge, struck the wagon at the hind wheels and threw me 12 or 15 feet forward on the street. I was knocked senseless, and do not know anything more about the particulars."

Dr. Vaughn testifies—

"That soon after the collision he was called to dress the petitioner's wounds, when he asked the petitioner as to the manner of their infliction. He replied that he had been run over by a locomotive at the crossing at St. John street and thrown into the ditch near by; that the rear of the wagon had been struck by the locomotive; that, hearing the bell and the locomotive coming, he tried to stop his horse; that the more he pulled the faster the horse went. Finding that he could not stop him, he tried to cross the track by driving him up, with the result as stated."

James Sykes testifies—

"That after the accident petitioner stated to him that he was driving his wagon, not thinking of the engine or cars until he approached near the corner of the warehouse; that he heard no bell is what I think he said, or, as I now recollect, he said he heard no noise; that the engine came suddenly by, or came in sight or view of his horse, who became very much frightened, and he gave him a cut with a whip to make him jump across the road ahead of the engine, which he thought was his only safety."

The undisputed physical facts are that the horse and fore wheels of the wagon had passed in front of the engine before any collision took place, and that either the end of the pilot ran into the hind wheels of the wagon, or by a sudden turn of the wagon to the left the hind wheels of the wagon ran upon the end of the pilot. From the rapidity with which the wagon must have been moving, and the slow motion of the engine at the time, I am of the opinion that the wagon ran on the pilot. The testimony of the engineer is that when he saw the petitioner he reversed the engine and put on the steam to stop it; he was scarcely moving the engine when the collision took place. This statement is sustained from the fact that the horse and fore wheels of the wagon passed in front of the engine before the collision took place, which could not have been done had the engine been moving at any but the slowest speed.

This is a sufficient statement of the facts as shown from the proof, with this addition, that the petitioner was well acquainted with the danger of the crossing, and the time of the making up and leaving of the trains. There is little difference of opinion as to the rules of law properly applicable to the facts as stated. See *Railroad Co.* v. *Houston*, 95 U. S. 697; *Tilfer* v. *Railroad Co.* 1 Brown, (N. J.) 188.

The petitioner, to entitle himself to compensation, must show—*First*, that the collision occurred without any negligence, carelessness, or wrongful act on his part; and, *second*, that it was the result of the carelessness, negligence, or some wrongful act upon the part of the employes of the defendant, or of the defendant himself. If it was from inevitable accident brought about by the unmanageable conduct of the horse, or otherwise, not attributable to the defendant or his employes, then no compensation can be allowed. These rules are so plain and so well understood that reference to the authorities to sustain them is unnecessary.

When a crossing is dangerous, the duty is imposed upon those engaged in conducting the engine and trains upon the road, and also upon those desiring to make the crossing, to use every reasonable precaution to avoid a collision; and the necessity is increased in proportion to the danger. This duty is required equally of both parties. It is the duty of those conducting the train to give a signal by having the bell rung, or blowing the whistle, when approaching a crossing, to warn passers of the approach of the engine or train, and to look and ascertain whether or not any one is about to cross the track in front of the locomotive, and if so, to slacken up the speed; and, if need be, and if in the power of those in charge of the train, to stop

the train, in order to avoid a collision. See *Cont. Imp. Co.* v. *Stead,* 95 U. S. 161.

This is the duty on one side, and upon the other it is the duty of those desiring to make the crossing to use their powers of hearing and of vision to ascertain whether or not there is likely to be a passing locomotive or train, and if so, to stop until the danger is past. If there is no obstruction to either the sound or vision, then the passer need not stop, but must use both these faculties; but if there is such obstruction then it is his duty to stop and both look and listen; and if he neglects to use these precautions and a collision takes place, compensation cannot be given, unless it was caused by gross negligence or wrongful conduct of the employes conducting the railroad operations; the general rule being that if the injured party contributes to bringing about the injury he cannot recover, although the employes may not be wholly blameless.

The petitioner knew the dangerous condition of the crossing; that the warehouse formed an obstruction to the sight and sound of the locomotive coming from the east; and also knew, or had reason to know, that it was the time for making up the train. It was therefore his duty, before attempting to cross the track, to both look and listen for the approach of the locomotive, and, if need be, to stop for that purpose. See *Pennsylvania R. Co.* v. *Beale,* 73 Pa. St. 504; *Allyn* v. *Boston, etc., R. Co.* 105 Mass. 77.

According to the admission of the petitioner, this he neglected to do until his horse was frightened by the approach of the locomotive. Had the horse not become frightened, he was a sufficient distance from the locomotive to have stopped him and waited for it to pass or get out of the way. Whether the fright of the petitioner caused him not to control his horse, or that the horse could not be controlled, the fact is that it was not done, and he urged him forward before the engine with the hope of escape, and the collision ensued. This calamity to the petitioner is certainly very much to be regretted, both on his account and those dependent upon him, but one which is difficult from the evidence to attribute to the defendant or his employes. See *New Orleans, etc., R Co.* v. *Mitchell,* 52 Miss. 808. The proof is that the horse was unusually gentle and used to crossing at that point, yet the proof is equally clear that on this occasion he became frightened without more than usual cause. Certainly this could not be apprehended by the engineer; he had a right to presume that the petitioner would stop until the danger was past, and could not reasonably suppose that the petitioner would run the hazard of attempting to cross in front of

the locomotive. The testimony of the engineer, supported by the physical facts referred to, show that the engine was nearly at a stand-still when the collision took place. The engineer could have done nothing more than he did. A careful consideration of the testimony satisfies me that the petitioner did not exercise the caution demanded of him, and that this cause, and his own alarm and reckless attempt to pass in front of the engine, with the fright and action of the horse, caused the collision, without fault upon the part of the defendant or of his employes. Wherefore, under the rules stated, compensation must be refused.